UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JUDY A. POSTON, | ) | |
|    *Plaintiff*, | ) | |
| | ) | |
|    vs. | ) | 1:08-cv-1543-JMS-LJM |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF THE SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
|    *Defendant*. | | |

## ENTRY REVIEWING THE COMMISSIONER'S DECISION

Plaintiff Judy A. Poston applied for Social Security Disability Insurance benefits and for Social Security Supplemental Security Income disability benefits on April 15, 2005. [R. 54-58.][1] After a series of administrative proceedings and appeals, including a hearing before Administrative Law Judge ("ALJ") Albert Velasquez, the agency denied Ms. Poston's application. [R. 24.] Ms. Poston then filed this action for judicial review of that denial.

The parties disagree as to the status of medical documents residing in Ms. Poston's previous applications that the ALJ expressly declined to reopen. The contested medical documents were not included in the certified record submitted to the Court, though it appears that the ALJ did consider this evidence in declining to reopen Ms. Poston's prior applications. Ms. Poston attaches and discusses these medical documents in her brief in support of the instant complaint. The Commissioner contends that these documents are not part of the record and, as such, the Court should disregard them. Neither Ms. Poston, nor the Commissioner, cite to authority supporting their respective contentions. Assuming without deciding that the evidence

---

[1] Upon the written consent of the parties, this matter has been assigned to the magistrate judge for all proceedings, including for the entry of judgment, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. [Dkt. 32.]

1

should be considered, the Court nevertheless finds the evidence to have no impact on the ultimate outcome of Ms. Poston's complaint. Accordingly, that evidence is included in the Court's discussion below.

## BACKGROUND

Ms. Poston's alleged disability onset date is December 31, 1995. The record reveals medical evidence both before and after this date. The Court describes each period.

### A. Medical Evidence Prior to the Alleged Onset Date

#### 1. The Car Accident and Initial Treatment

On September 28, 1994, Ms. Poston visited Wishard Hospital ("Wishard") and described a car accident and fall on the ice the previous winter. [R. 271.] She complained of lower back pain and left arm numbness. [*Id*.] The attending doctor determined that her strength and reflexes were ordinary and that the range of motion in her neck was normal. [*Id*.] The doctor diagnosed Ms. Poston with possible cervical radiculopathy, ordered MRIs and X-rays, and prescribed pain medication. [*Id*.]

The X-ray revealed a "slight disc space narrowing" but that "overall alignment [was] intact," and it listed an impression of degenerative disc disease. [R. 272.] The MRI analysis described "severe spinal stenosis… and disc herniation causing cord flattening" in one part of the back and "disc bulge causing moderate spinal stenosis" in another. [R. 273.] On November 9, 1994, Ms. Poston returned to Wishard for further examination. [R. 274.] The attending doctor concluded that muscle strength and reflexes were normal, that sensation in the arms was "grossly intact," and confirmed the findings of the MRI. [*Id*.]

###   2. Pain and Treatment, 1995

In April 1995, Wishard's Forest Manor Clinic ("<u>Forest Manor</u>") took Ms. Poston into its care. [R. 276.] Dr. Mary Kleaveland ascertained that Ms. Poston wanted "meds for back and neck pain." [*Id.*] While determining that her pain was the result of cervical spondylosis, Dr. Kleaveland observed that Ms. Poston had normal muscle strength, reflexes, and sensation. [*Id.*] Dr. Kleaveland prescribed prescription pain medication with no refills.

Two months later, Ms. Poston returned to Forest Manor. [R. 277] She complained of a loss of balance and lower back pain when she moved. [*Id.*] After evaluation, Dr. Kleaveland determined Ms. Poston had full muscle strength, that her senses were intact, that her reflexes were normal, and that her positive straight leg raising test was at 30 degrees. [*Id.*] Dr. Kleaveland concluded Ms. Poston had a "back strain." [*Id.*]

On July 13, 1995, Ms. Poston again returned to Forest Manor. [R. 278.] She described her pain as "much better now." [*Id.*] Dr. Kalpuna Jindal recorded Ms. Poston had a negative straight leg raising test, full movement, and full muscle strength. [*Id.*]

## B. Medical Evidence After the Alleged Onset Date

###   1. Pain and Treatment, 1997-1999

From April 1997 through November 1998, Ms. Poston underwent a series of examinations and MRIs in Florida. [Pl.'s Brf. 37-53] An MRI of Ms. Poston's cervical spine left an impression of "degenerative changes" with "no evidence of acute fracture, dislocation or malalignment." [*Id.* at 37] An MRI of Ms. Poston's lumbar spine left an impression of some "lateral disc herniation," "small . . . disc protrusions," a "small area of degenerative signal," and an "L5 disc desiccation." [*Id.* at 44-45] In examining Ms. Poston, Dr. Eddie Sassoon noted

decreased sensation and grasp, limited cervical mobility, and limited rotation and lateral bending. Dr. Sassoon recommended "conservative approaches to treatment. [*Id.* at 48]

### 2. Pain and Treatment, 2002

On February 2, 2002, Ms. Poston returned to Forest Manor complaining of numbness in both hands, abdominal pain, and neck, shoulder and upper back pain that was exacerbated by "activity especially when trying to clean or vacuum." [R. 279.] Ms. Poston asserted that rest helped alleviate the pain. [*Id.*] Dr. Robert Litt discussed "spinal stenosis – cervical" and a possible herniated disk in the neck. [*Id.*]

In December of 2002, Ms. Poston visited with Dr. Michael Weeks at Forest Manor. [R. 280-81] Ms. Poston again described lower back pain. [R. 280] Dr. Weeks ordered a spinal test and prescribed prescription pain and anti-inflammatory medication. [*Id.*]

### 3. Pain and Treatment, 2003

On January 31, 2003, Dr. Broderick Rhyant saw Ms. Poston at Forest Manor. Ms. Poston complained of chronic lower back pain and progressively worsening pain in the neck, back, buttocks and thigh. [R. 282.] The pain increased sharply with activity such as cooking and cleaning. [*Id.*] While physical therapy undergone two years prior had not helped, Ms. Poston asserted that chiropractic care and Vicodin relieved the pain. [*Id.*] Dr. Rhyant noted that Ms. Poston needed refills of Elavil and Vicodin. [*Id.*] Ms. Poston's muscle strength was "grossly intact" and her reflexes were "symmetrical."

A little over a month later, Ms. Poston visited Wishard's pain clinic describing "dull achy" lower back and neck pain that radiated to the buttocks and thighs. [R. 283-86.] Ms. Poston noted that relief occurred with "massage, heat, support and pillows." [R. 285.] Ms. Poston's senses were "intact throughout;" she had full muscle strength and normal reflexes. [R.

284-86.]   Dr. Perez-Majul diagnosed Ms. Poston with radiculopathy and degenerative joint disease in the spine and provided trigger point injections.  [R. 283-86.]

In May 2003, an X-ray of Ms. Poston revealed "loss of disc space height . . . with retrolisthesis of C5 on C6."  The radiology report indicated that Ms. Poston had "no fracture," that the "vertebral alignment is normal," and that "vertebral body heights are likewise unremarkable with normal disc spacing."  In addition, the X-ray revealed a " . . . relatively mild loss of disc space height of the C3-C4, C4-C5, and C5-C6 levels.  Small amount of retrolisthesis of C5 [and] [C]6 is also seen.  Prevertebral soft tissues are normal."  [R. 287.]

Shortly thereafter, on May 20, 2003, Ms. Poston visited Wishard's neurology service area.  [R. 288.]  Ms. Poston complained of tightness in the neck, numbness in the left upper extremity, headaches twice a month, radiculopathy in the left lower extremity after exertion, and whole body muscle aches after sexual intercourse.  [R. 289.]  Ms. Poston revealed previous alcohol consumption of two bottles of wine per day, but had reduced that to two bottles per week.  [*Id.*]  Dr. Karen Roos, in a remarkably extensive examination and evaluation, noted Ms. Poston had normal strength and muscle tone throughout, reflexes "1+ in the . . . extremities throughout and 2+ bilaterally in the knee jerk and ankle . . . bilaterally," and regarding sensation: "[L]ess pinprick in the distal left upper extremity but increased sensation to pinprick in the proximal left upper extremity."  [R. 290.]  Ms. Poston's gait was "normal casual," though she had "some difficulty with heel walking."  [*Id.*]

On July 2, 2003, Ms. Poston visited Dr. Cathy Scott for pain management.  [R. 293.]  Ms. Poston described anxiety, but denied depression.  [*Id.*]  Ms. Poston denied the utilization of counseling, massage, acupuncture or hypnosis, but indicated that "Vicodin and muscle relaxers help."  [R. 293]  Dr. Scott diagnosed Ms. Poston with anxiety disorder.  [*Id.*]

5

In November 2003, Dr. Rhyant returned a call from Ms. Poston "concerning p[re]scription refills." [R. 297] Ms. Poston had requested Metformin and Vicodin refills. [*Id.*] Dr. Rhyant informed Ms. Poston that she already had a Vicodin prescription from Dr. Mackie. [*Id.*] Ms. Poston indicated that she was unaware of the prescription. [*Id.*]

### 4. Pain and Treatment, 2004

On June 28, 2004, Ms. Poston entered the Wishard emergency room with neck and back pain, bowel incontinence and paresthesia in her left arm and leg. [R. 251.] Ms. Poston's "[n]euro exam was normal and non-focal." [*Id.*] She had normal sensation and motor strength, was encouraged to obtain a neurological consultation, and was prescribed Hydrocodone and Ibuprofen. [R. 242-43.]

Ms. Poston underwent an MRI on January 6, 2005. [R. 145.] The MRI impression indicated "cervical spine degenerative changes, particularly at C4-C5 and C5-C6 with central canal and neural foraminal stenosis . . . [along with] [m]ild lumber spine degenerative changes, particularly at L5-S1." [*Id.*]

### 5. Pain and Treatment, 2005

On March 4, 2005, Ms. Poston visited Wishard's neurological clinic. [R. 256.] Ms. Poston described pain in her neck and right upper extremity with numbness and tingling in her forearms, hands and in the right upper-arm. [*Id.*] After noting the results of the pervious MRI, Dr. Bette Maybury examined Ms. Poston and found her walking to be normal and recorded that "she is able to walk on her toes, heels, and tandem." [R. 257.] Dr. Maybury also noted normal motor strength and tone, muscle stretch reflexes "1+ and symmetric in the upper extremities and 2+ at the knee and 1+ at the ankles," and diminished pinprick sensation in the distal upper and

lower extremities with light touch intact. [*Id.*] Dr. Maybury's impression was of a right cervical root compression and peripheral polyneuropathy. [*Id.*]

In April 2005, Ms. Poston underwent an EMG evaluation at Wishard. [R. 220] The evaluation revealed evidence of an old or chronic C7 radiculopathy on the left. [*Id.*]

Two months later, Dr. Iyas K. Yousef examined Ms. Poston. [R. 213-16.] Ms. Poston indicated that she had no relief from physical therapy or steroid injections and that she could not walk on her heels because of back pain. [R. 213-15.]

In July 2005, Dr. Sands conducted a Residual Functional Capacity ("RFC") assessment of Ms. Poston. Dr. Sands concluded that Ms. Poston was not disabled and that she could sit or stand for a total of six hours in an eight hour work day. [R. 31, 205-12.] These determinations were later affirmed by Dr. A. Dobson. [R. 30, 212.]

On October 25, 2005, Dr. Rhyant made objective findings that included C7 radiculopathy and lumbar degenerative joint disease. Dr. Rhyant reported that Ms. Poston's symptoms would continue indefinitely. [R. 308.] Two days later, Dr. Sands and a Dr. Larsen submitted a Disability Determination and Transmittal Form ("DDTF") that indicated Ms. Poston was not disabled. This conclusion was affirmed in December of 2005 by Dr. A. Dobson. [R. 30.]

### 6. Pain and Treatment, 2006

In March 2006, Ms. Poston received epidural injections to relieve pain in her back. [R. 329.] She was diagnosed with cervical spondylosis, cervical disc displacement, and cervical radiculopahy. [*Id.*] Later that month, Dr. Walkin of Wishard Health services determined that Ms. Poston had normal range of motion, normal strength, and a negative straight leg test. [R. 315] On the same day, Dr. Palmer Mackie noted that Ms. Poston had disrupted her pain management class. [R. 326] Of particular concern, Dr. Mackie described Ms. Poston as

7

"evasive" when describing the amount of alcohol and opioids she was taking. Ms. Poston failed to return for an appointment a month later and was released from the pain clinic. [R. 322, 326.]

### 7. Pain and Treatment, 2007

On July 20, 2007, Ms. Poston underwent yet another MRI that indicated cervical root compression and neck pain. [R. 335] Days later, on August 1, 2007, Dr. Rhyant completed a Physical Capacities Evaluation form on behalf of Ms. Poston. [R. 337-38.] Among other things, Dr. Rhyant's report indicated that Ms. Poston could only sit or stand for thirty minutes in an eight hour day. [R. 338] However, Dr. Rhyant expressly noted the following: "Above comments are subjective responses per patient. Not observations in functional assessment." [*Id.*]

## STANDARD OF REVIEW

The findings and decision made by the ALJ will be affirmed if supported by substantial evidence. *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004) (citation omitted). In the process of reviewing the decision, the Court may *not* "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Substantial evidence is present if "a reasonable person would accept it as adequate to support the conclusion." *Id.* (citation omitted). In addition, substantial evidence requires more than "a mere scintilla of proof." *Powers v. Apfel*, 207 F.3d 431 (7th Cir. 2000) (citation omitted).

## DETERMINING DISABILITY

For the purposes of the Social Security Act, a "disability" means an "inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord id.* at § 1382c(a)(3). A person is disabled if the impairments "are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A); *accord id.* at § 1382c(a)(3)(B). To evaluate each claimant under these standards, an ALJ will utilize a five-step inquiry:

> (1) [is] the claimant . . . currently employed, (2) [does] the claimant ha[ve] a severe impairment, (3) [is] the claimant's impairment . . . one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, . . . can she perform her past relevant work, and (5) is the claimant . . . capable of performing any work in the national economy[?]

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted).

## DISCUSSION

Ms. Poston makes four broad arguments on appeal. First, Ms. Poston sweepingly argues that the ALJ's determination denied her due process. Second, Ms. Poston argues that substantial evidence does not support the ALJ's Step Three finding that Ms. Poston's impairments do not meet or equal Listing 1.04A. Third, Ms. Poston challenges the ALJ's Residual Functional Capacity ("RFC") and negative credibility findings. Finally, Ms. Poston challenges the ALJ's Step Five determination that Ms. Poston could work in the national economy. The Court considers each of these arguments in turn.

### A. Poston's Global Due Process Argument

Ms. Poston first contends that the ALJ's consideration of her claim constituted a denial of due process. [Pl.'s Brf. 18.] She believes that the ALJ is part of an "institutional-agency wide policy and procedure of only selectively considering the evidence in the record." [*Id.* at 19.] But Ms. Poston cites no specific evidence in support of this contention, nor does she develop her

argument. She has therefore waived any error on this basis, as other claimants who have tried the same stratagem have found out. Indeed, this argument is nearly identical to one found in *Reese v. Astrue*, 2009 WL 499601 (S.D. Ind. February 27, 2009). In *Reese*, the court determined:

> While long on charges, this argument is short on substance: not only did Mr. Reese fail to present the legal standards for determining the issue, he failed to submit, cite, or even refer to any evidence of an institutional or agency-wide policy and procedure by the SSA of refusing to consider evidence favorable to claimants' disabilities. Therefore, his argument is forfeited.

*Id.* at *5.

The Court finds Ms. Poston's argument similarly without merit and forfeited.

### B. Poston's Challenge to the ALJ's Step Three Determination

Ms. Poston next challenges the ALJ's Step Three determination. At Step Three, the ALJ cited the results of three MRIs in concluding that Ms. Poston has a severe impairment—"degenerative disc disease of the cervical and lumbar spine." [R. 17-18.] However, after comparing her impairments to the severity requirements necessary to obtain disability at Step Three, the ALJ determined that "[Ms. Poston's] severe impairments are not attended by medical signs or laboratory findings which meet or equal in severity any impairment contained in the Listing of Impairments found in Appendix 1, Subpart P, Regulations No. 4." [R. 19.] Specifically, the ALJ concluded that Ms. Poston's impairments did not meet or equal the "motor, sensory or reflex loss" requirements of Medical Listing 1.04, which discusses disorders of the spine. [*Id.*] The ALJ supported his conclusion in two ways. First, he pointed to medical history from the record supporting the finding: "While imaging noted cervical nerve root compression, upper extremity motor strength was normal and equal, reflexes were 2+ and equal, and sensation of the arms was noted to be grossly intact (Ex. B at 4)." [*Id.*] And second, he noted that his

10

finding "[was] consistent with the opinions of the medical experts with Disability Determination Services (Ex. 1F at 71-78)." [*Id.*]

Ms. Poston counters those findings with two arguments. The Court addresses each.

### 1. Poston's Medical Advisor Argument

Ms. Poston contends that the ALJ failed to make an informed decision because he did not order the testimony of a medical expert at Ms. Poston's administrative hearing. [Pl.'s Brf. at 20.] Ms. Poston cites *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004), where the Seventh Circuit asserted: "Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." Yet, contrary to Ms. Poston's assertion, the ALJ *did* consider an expert's opinion on the matter. [R. 19.]

In *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004), the Seventh Circuit declared that Disability Determination and Transmittal Forms ("DDTF") decisively establish that "'consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review'" (quoting *Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989)). In *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (2006), the Seventh Circuit considered a situation where an ALJ gave only a cursory (two sentence) explanation of his Step Three finding. The ALJ did not mention the Listing used to evaluate the claim, nor did he discuss a single shred of evidence favorable to the claimant—or any evidence at all. *Id.* at 583. Thus, the *Ribaudo* court elaborated on the DDTF rule presented in *Scheck*, explaining that "the ALJ may rely solely on opinions given in Disability Determination and Transmittal forms and provide little additional explanation only so long as there is no contradictory evidence in the record." *Id.* at 584.

In the instant case, Dr. Sands and Dr. Larsen each determined in a DDTF that Ms. Poston did not have a disability. [R. 31.] Dr. Dobson endorsed that decision a month later on an identical form. [R. 30.] In his finding, the ALJ expressly declared the Listing (1.04A), mentioned evidence from the record favorable to Ms. Poston, described the evidence from the record supporting his finding, and then concluded by grounding his finding in the aforementioned DDTFs. [R. 19.] In this, the ALJ satisfactorily met the requisite standard for considering an expert's opinion on medical equivalency when he *expressly* grounded his finding in the DDTFs of Drs. Sands, Larsen and Dobson and supported it with evidence from the record. [*Id.*]

Ms. Poston's argument here is unavailing.

### 2. Poston's "Ignore," "Misstate" and "Arbitrarily Reject" Argument

In her second Step Three argument, Ms. Poston contends that the ALJ alternatively "ignored without explanation" and "misstated and arbitrarily rejected" the medical evidence allegedly proving Ms. Poston's disability. [Pl.'s Brf. at 21.] Ms. Poston also alleges the ALJ adopted the "erroneous opinions of the agency physicians." [*Id.*] Ms. Poston then proceeds to cite to a collection of cases that make such missteps reversible error. [*Id.*]

When writing a disability decision, an ALJ need not discuss every piece of evidence. *Diaz v. Chater*, 55 F.3d 300 (7th Cir. 1995). Rather, the ALJ must only "build a [logical] bridge from the evidence to the conclusion." *Groves v. Apfel*, 148 F.3d 809 (7th Cir. 1998) (citations omitted). Listing 1.04A requires:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, *motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss* and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). (Emphasis added is that of the Court) 20 C.F.R., Part 404, Subpart P, Appendix 1, §1.04A.

It is Ms. Poston's burden to meet each of these criteria. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (citations omitted).

Ms. Poston's attack of the ALJ's opinion on this point again resembles *Reese*. In *Reese*, the court described the Plaintiff's modus operandi: "[After making allegations of reversible error], the remainder of his argument consists of descriptions of several reports and parts of reports in the Record that he contends the ALJ ignored or misstated, without accompanying explanations of the significance of these reports that required the ALJ to specifically address them." *Reese*, 2009 WL 499601 at *5.

Over the course of twelve pages of briefing here, Ms. Poston utilizes the formulaic approach used in *Reese*. [Pl.'s Brf. at 22-33.] First, she conclusively states that the ALJ "misstated," "ignored," or "arbitrarily rejected" a medical report. [*Id*.] Then, she inserts the raw text from the report. [*Id*.] These dumps of text from medical reports run from a few disjointed words or sentences to an entire page in one instance. [*Id*.] At some points, Ms. Poston italicizes certain portions of medical text *without explanation of their significance*. In *Reese*, the court made clear: "[A] bare listing of evidence not specifically addressed by the ALJ fails to present an issue on review." 2009 WL 499601 at *5. Ms. Poston conducts no analysis or application of the law to facts, nor does she explain why each report cited is legally significant.

As the Commissioner correctly points out, such tactics amount to a waiver: "[H]e simply refers to the standards and cites to a large number of pages that he believes were overlooked, all without providing any analysis or context . . .Whitlow has essentially waived for review his arguments." *Whitlow v. Astrue*, 2009 WL 648602, *8 (S.D. Ind. March 10, 2009). The courts in this District have made one thing clear, and apparently it bears repeating:  This method of argumentation is not argumentation at all. Unfortunately for Ms. Poston, the Court finds the

formulaic concoctions toxic to her contentions. The Court cannot and will not forge new arguments for her.

In any event, the Court's own review of the record has determined that substantial evidence supports the ALJ's conclusion that the lack of "motor, sensory or reflex loss" in Ms. Poston's back problems did not meet or equal the medical requirements of Listing 1.04A. [R. 19.] The ALJ cited to evidence supporting this conclusion in the opinions of the state reviewing physicians who had reviewed the evidence. [R. 19, 30-31, 205-212]. The Court notes that the record of facts outlined above is consistent with the substantial evidence found by both the ALJ and the state reviewing physicians.

The Court finds both Ms. Poston's legal methods and arguments unpersuasive. Ms. Poston did not meet her burden of establishing each of the criteria under Listing 1.04A. Conversely, the ALJ constructed a logical bridge between Ms. Poston's lack of "motor, sensory and reflex loss," the state examining physician's determination that she was not disabled and cited medical imaging evidence from the record. [R. 19.]  There was no error at Step 3.

### C. Ms. Poston's Challenge to the ALJ's RFC Finding and Negative Credibility Determination

#### 1. The RFC Finding

Ms. Poston challenges the ALJ's RFC finding, contending that the ALJ "arbitrarily rejected the 8-1-07 physical capacities evaluation by [the patient's treating physician] Dr. Rhyant . . . ." [Pl.'s Brf. at 32-33]  Dr. Rhyant (her treating physician) filled out a Physical Capacities Evaluation form. [R. 337-338]  However, the ALJ left out many of the capability determinations made by Dr. Rhyant in making his own RFC finding. [R. 19.]  Of course, the ALJ did not pull his findings from thin air. Rather, the ALJ rooted his conclusions in an RFC form filled out by Dr. Sands and affirmed by Dr. Dobson. [R. at 22, 205-212]  For instance, while Dr. Rhyant's

form indicated Ms. Poston could never lift eleven to twenty pounds, Dr. Sands' RFC form concluded—and the ALJ accordingly found—that Ms. Poston could lift twenty pounds occasionally. [R. at 21, 338.] As a result, the ALJ determined that Ms. Poston could do work in the national economy and therein did not pass through Step Five. [R. 19-22.]

To determine in Step Five whether the claimant can do work in the national economy, the Social Security Administration determines prior to Step Four what residual skills the claimant might utilize—the claimant's RFC. The treating physician's opinion "is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) (citations omitted). However, an ALJ need not provide such deference if the doctor's evaluation is inconsistent with substantial evidence in the record. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). After scrutinizing the record and the credibility of the claimant, the ALJ—in consultation with a vocational expert—makes the final RFC determination and Step Five finding. *Clifford v. Apfel*, 270 F.3d 1171 (7th Cir. 2000) (citation omitted).

Given the narrow standard of review, the ALJ's RFC determination is sustainable for two complementary reasons. First, if a treating physician's Physical Capacities Evaluation form is either "internally inconsistent" or "based solely on the patient's subjective complaints," then the ALJ may discount it. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *see also Elder*, 529 F.3d at 415. Here, Dr. Rhyant's form was both; Dr. Rhyant conceded his report's conclusions were not objective. [R. 22, 337-338.] Though Dr. Rhyant indeed filled out the Physical Capacities Evaluation form, the ALJ noted that Dr. Rhyant qualified his evaluation by asserting that "above comments are subjective responses per patient." [R. 22,338.] Thus,

15

second, without *objective* guidance from the claimant's treating physician, the ALJ correctly looked to the RFC form and medical determinations of Dr. Sands' RFC form.

The Court finds that Ms. Poston's first challenge to the RFC lacks merit.

### 2. The Negative Credibility Determination

The ALJ determined that Ms. Poston had a physical impairment that could produce the symptoms she described. [R. 20.] However, the ALJ found that "[Ms. Poston's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible…." [*Id.*] Ms. Poston challenges this finding, maintaining the ALJ's determination was contrary to evidence in the record, Social Security Ruling 96-7p and 20 C.F.R. § 404.1529 and § 416.929. [Pl.'s Brf. at 34.]

> As part of the RFC process, Social Security Rule 96-4p states:
>
> Once the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the pain or other symptoms alleged has been established on the basis of medical signs and laboratory findings, *allegations about the intensity and persistence of the symptoms must be considered with the objective medical abnormalities, and all other evidence in the case record, in evaluating the functionally limiting effects of the impairment(s).*

SSR 96-4p (emphasis added).

Meanwhile, Social Security Ruling 96-7 and 20 C.F.R. § 404.1529 and § 416.929 set out seven factors the ALJ should consider in making this credibility determination.

The ALJ went through a detailed (nearly two page) analysis which painstakingly describes the rationale and medical record evidence supporting his negative credibility determination. [R. 20-21.] However, in challenging this determination, Ms. Poston points to nothing in the record that would indicate the ALJ "ignored or arbitrarily rejected" evidence in contravention of Social Security Ruling 96-7p. Moreover, she does not indicate what specific

pieces of evidence "relevant to all of the [seven] factors" were ignored. Again, Ms. Poston's argument is undeveloped and therefore waived.

### D. Poston's Challenge to the ALJ's Step Five Determination

Finally, Ms. Poston contends that the "ALJ's [RFC assessment] omits all of the impairments proved by the evidence in the record . . . ." [Pl.'s Brf. at 35] Ms. Poston reminds the Court that it must remand a case when "an ALJ fails to give full consideration to all of claimant's documented impairments . . . ." Unfortunately, Ms. Poston yet again does not back such assertions with legal analysis or evidence from the record. Nor, in fact, does Ms. Poston assert what particular pieces of evidence were omitted and should have been discussed.

The Court finds Ms. Poston's argument here are also forfeited.

### CONCLUSION

The Court finds Ms. Poston's arguments alternatively without merit, unpersuasive and waived. In addition, the Court holds that substantial evidence exists to support the ALJ's findings and decision, which is **AFFIRMED**. Final judgment will be entered accordingly.

03/15/2010

                                                       Jane Magnus-Stinson
                                                      United States Magistrate Judge
                                                      Southern District of Indiana

**Distribution via CM/ECF only:**

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Patrick Harold Mulvany
mulvany@onet.net